Good morning. May it please the court, counsel. I would respectfully request to reserve three minutes for rebuttal as time permits. My name is Jeffrey Yeager and I represent the appellant, Market Scan Information Systems. Market Scan is a family owned company that's been in the business of providing computer systems for automobile dealerships that calculate, scan since the late 1980s. And this case actually arises out of a specific computer system that was installed at the plaintiff's dealership in 1998. At the heart of this appeal is whether plaintiff's claims are time barred as a result of their waiting over five years to file their lawsuit after they were first on notice of their claims. And also whether Market Scan was- That's the question, not the answer, isn't it? What's that? Why were they first on notice of their claims? Perhaps it's the issue and not the question, Your Honor. And I think tied to that though is also whether Market Scan was provided with a fair opportunity to present its case in light of the fact that it was dealing with stale evidence, stale memories, and in at least one case, bulliation of evidence. But it all goes back, I think, to the fact that we're talking about a claim that clearly arose in 1999 to the extent there was a claim. There's four broad issues. One- If they had sued you in 1999, I presume you would have said, but they never gave us a chance to fix it. I believe that if they had alleged that the system never worked for an entire year, I mean, if they did not give us the opportunity to fix it, absolutely. I think that wouldn't be a potential defense. Again, remember, there was a limitation of warranties in these license agreements. And certainly, Market Scan provided a helpline, technical support, and all kinds of services. But remember, the testimony here of the plaintiff, the owner of the plaintiff's dealership, was that the system never worked. And that's actually on page 10 of their brief. They actually say the system never worked. We're talking about, again, if the claim accrued before April 15, 2000, the four-year statute of limitations bars the claim. But I thought that, maybe correct me if I'm wrong, but as I recall the record, maybe it never worked. But then Market Scan said, well, the problem is, you know, your modem and you Chevrolet's computer system is not congruent here. It's not our software. It's our interface with you. So that seems, that's not inconsistent with him saying it didn't work. So I'm not quite sure. That's sort of like pointing fingers at each other and do you have a claim yet when you're saying it's their fault and they're saying, no, it's your fault? Well, I guess we've got to separate out the discovery rule from the doctrine of repair estoppel. I think the discovery, under the discovery doctrine under California law, even if you don't have the evidence that it's your fault, the discovery rule can still apply for your claim to accrue because all you have to do is be on suspicion of wrongdoing. Clearly, performance was pointing the finger back in 1999. They weren't taking responsibility for problems on their end. So that clearly put them on notice of a claim. That's the discovery rule. Now, if you want to talk about the doctrine of repair estoppel, that's a distinct doctrine. Now, it's kind of evolved throughout this case and I think it's first clearly been out. Well, let me just ask you about that. I mean, I know there's two separate rules and there is some overlap. But on the discovery rule, if you thought you had a problem and then you said, no, it's actually your problem, and so then you make some changes because you in good faith think that the market scan is telling you it's your problem, why would you be on a discovery at that point when you have to kind of write it out and see if it in fact is your hardware or interface problem instead of their software problem? Two things. One is you are talking about an obligation to discover the source of the problem yourself. If it's something that's actually completely rendering the system valueless and that's actually what the jury found, because remember, the special interrogatories broke down the time period to coincide with the statute of limitations and they granted damages for the entire time period from the- Well, but that's because there could be a breach from the beginning even if the discovery wasn't until later, right? That's correct. So that's really not relevant in particular. I think it is when you, though, talk about the amount of time you're talking about here. For them to claim that this system was valueless for a year, over a year, and yet they weren't on inquiry notice that this was something that they should be accusing market scan of and filing a lawsuit- Well, what about the fact that this product is not a static product, right? In other words, their problem was access to a server. So it's not like you buy a TV and a TV's in your house and it's now broken or not broken. What they were leasing was access to your server and it seems to me to be a sort of ongoing product. The fact that it didn't work on day one doesn't mean it won't work on day two because there's an interface and the problem could have been at your end. So that's another problem with all this, why it's different than an ordinary product. It's not something you bought and walked away with. I think that gets to the idea of a continuing wrong type doctrine, which was argued in the court below. It's not so much a continuing wrong, but it means that the discovery issue seems to be different because even if you think on day one that it's not working, that doesn't mean that you know that it's not going to work on day two. But if the system didn't work for, again, taking the 70% figure that the plaintiff testified as to if the system didn't work for 255 days during 1999, whether or not that's something that they believe that MarketScan might yet fix, there's still a breach. But they never said it never worked. I mean, when they said it didn't work from day one, it didn't mean that it never worked. I mean, we know that it worked some of the time. And Your Honor, he said 70% of the time. And part of the problem is you have an inchoate record here because you are talking about a huge lapse of time, not just between the time that repairs allegedly were ceased, but from the time they boxed up the computer. Remember, they boxed up the computer in 2001. And although we find out later that the computer didn't sit in that box that whole time, but there was a two and a half year period where they did nothing before they filed a lawsuit. During this time, you do have the fact that evidence hasn't been preserved. Witnesses have moved away and their locations have been lost. And you do actually have the actual computer system at issue having its hard drive wiped during this lapse. I mean, there is a specific doctrine that addresses whether or not somebody is relying on repair efforts in delaying lawsuits. And there are two requirements to rely upon that doctrine of repair estoppel. One is that the promise has to be to repair a specific defect. It's not that, and again, when we talk about MarketScan providing technical support, a helpline, they tried to help performance work through the issues even when MarketScan believed that the problems were on their end. Now, that doesn't mean they were taking responsibility to provide the phone line. But it does mean they tried to help them narrow down the problems. But whether or not plaintiffs relied on any specific promise, a specific affirmation that this is our fault, there's a complete dearth of evidence to support that. And remember, repair estoppel is a tolling doctrine and that would have been their burden to come forward with that kind of evidence. Let me change the subject for a second if I might, Mr. Yeager. I'd like to ask you about Mr. Hannigan's testimony. Apparently, Judge Windmill recognized that he had made a mistake in I guess what, first permitting it and then he should have disallowed it. And then he gave some kind of cautionary instruction to the jury, which strikes me as very problematic in the way he phrased it. Their answer is basically, if there's error, it's harmless, I guess. Why wasn't it harmless? You know, I'd go back to their motion in limine and I know they've tried to back off of this statement. But in their motion in limine, they said that these two witnesses, Kevin Hannigan and Jennifer Hanna, were the, you know what, let me actually get the quote. They stated in their April 16, 2006 response to defendant's motion in limine regarding testimony of non-party customers to defendant, that these witnesses were to be used to prove that MarketScan had a, quote, routine practice of, quote, ignoring the service and software needs of its customers. And then at page 10 of that response, they specifically said, in this case, there is no other means by which performance Chevrolet can show the jury that problems were on MarketScan's end. But what if they said there were other dealers like that person? They just didn't bring them in once they thought they could bring him in. Well, that goes to the issue of habit testimony, which again, they tried to claim at trial where we weren't really offering them for habit testimony. They were. But why is it habit? This is a product. In other words, what he was trying to demonstrate was that this thing, this system, didn't work. Why is that a habit problem? Well, it's not. But that's what they tried to use this. And that's what they used these witnesses to establish, that MarketScan had a habit of ignoring its customers and specifically in Idaho and Washington. It was in the closing argument. But they used that word, and it also has a legal meaning in the Rules of Evidence. It does. But that's not really the rule that the district court analyzed it under. And the district court was incorrect to analyze it under the other character, the character evidence rule. Back to Judge Berzon's question, how is it habit? Again, it's, I would say it's not. But again, the problem is what they were trying to establish was we've got two dealers. And if we bring out these two dealers, you must know... The system doesn't work, which doesn't seem to me the question of a habit. It's the, whether when they plug into the system and try and update it, it doesn't work. What does that have to do with a habit? It's a physical set of connections, and it doesn't work. But that wasn't their theory of the case, Your Honor. Do you agree that calling it a habit is kind of a misnomer? It's a relevancy problem, right? It is a relevancy problem. Whatever you call it, you can call a habit a widget. You can call it whatever you want. It's a relevancy problem. Why is it irrelevant? And that's what the judge analyzed it under. Well, I think it was, the judge analyzed it under the character rule, which I don't think is also correct. Well, I thought it was both under relevance and character. The character analysis was favorable to you for the same reason. I don't see why, I mean, the reason why we don't like character evidence is because people can change. And the fact that they do something today doesn't mean they're going to do it tomorrow. And so we don't like character evidence. But when you have an object or a set of wires, the notion that they're going to behave consistently is not a foolish notion or one that we want to discourage. Okay. Separate. This isn't, understand there's, again, also put yourself back in the late 90s. This isn't the Internet of today. You are talking about connections being made by telephone lines. It's not through cable. And they were using a telephone modem at the time. Exactly. We're talking about a telephone modem. The ability to make connections depended on a lot more factors back in the late 90s than they do now. So you could have a problem with one dealership. That's right. And that's why they call the other dealers to say, I have the same problem too. Why is that irrelevant? But to cherry pick two dealers. Well, then you could cherry pick your own dealers and say it works fine. Also, wasn't the problem that the judge put time limits on? My guess is they would have been happy to put more people on, but the judge didn't let them. Both sides were subject to that time limit. That's what I mean. As much as I would have loved. Hearing, he says it's a tight fit in this case, recognizing that you just couldn't bring in any dealer off the street. There had to be similarities in the nature of the services and what happened. So our job, I guess, is to figure out if that's an abuse of discretion, given the judge's findings. And I think the problem is it's not just a set of wires that's the same at every dealership. And again, we go back to the issue where they say, well, we didn't sue because we thought you were going to repair. We thought you were going to repair. And when they argue to the It is arguing habit. It's saying, hey, look at this Idaho dealer, look at this Washington dealer, just like us. Now, we disagree that they were just like them, but it's still, again, remember, it's their burden. Plaintiff's burden is the proponent of the evidence to establish the standards for it to be habit or character evidence. And they argued it as habit and character, whether or not they analyzed it under that rubric. That's how they argued it. It's how they argued it in their closing argument. Was there objection to that in closing argument? There was objection to the evidence going in at closing argument. It was not made. But I do think that the closing argument corroborates that that is what the evidence was being used for during the course of the hearing. Your time is up, I see, Mr. Yeager. Thank you very much. Thank you. For Performance Chevrolet. May it please the Court, I'm Nicole Hancock, representing Performance Chevrolet on this matter. I think I'd like to start with the last point that we were discussing and how the other dealers were used in this case. Hannigan and Ms. Hanna were not used to show habit or MarketScan's habit of ignoring their Idaho customers. What they were used to show is circumstantial evidence that the problems were not on Performance Chevrolet's end. MarketScan came in and said that it was Performance Chevrolet's problem that the system never worked properly, namely that it was the dial-up connection or it was their phone line or that they had a dual switch on their phone. What we brought the other dealers in for was to show that they had different phone lines, different types of connections. Ms. Hanna had a T1 connection, not a dial-up connection, yet she had the same download problems. And Mr. Hannigan had the same problems as well. And so all of that was circumstantial evidence to show that even though other dealers with different types of connections, different dial-ups, where they had a dedicated phone line without an A-B switch on it, they were still suffering the same problems of not getting their entire download to them. So we were, Mr., excuse me, Judge Winmo allowed that evidence as evidence of another act. And as you noted, he conducted a separate evidentiary hearing just to ensure that we didn't step outside the bounds of what would be relevant and what would be considered useful for showing how Performance Chevrolet's system did, their end of the deal, I guess, did work properly. Judge Winmo's cautionary instruction to the jury is a little wacky, isn't it? He says, I should have allowed them to be deposed. They weren't deposed. But on the other hand, there were other people who would say the same thing, so I'm going to let this guy testify. Telling the jury something like that. I don't usually call Judge Winmo wacky, but I think that he did the right thing in letting them know that we have listed. He should tell the jury there are other witnesses who would say the same thing? I think that that's the truth. That is what he said. What he exactly said, I think, is there were other witnesses on the same general subject matter. That could have testified. And we had affidavits in the record to support that that were already presented to the court, and we had those witnesses who were. You know, jurors don't get told, we have other people who would say this or that. I mean, they have to come in and testify. This is Judge Winmo's explanation for why he allowed this witness to testify who hadn't been deposed. I mean, he's trying to explain, he made a mistake, he realized he made a mistake in trying to, you know, rectify it in some way. I'm concerned that he basically told the jury that there were other people who would have said the same thing. But I don't think that he said that they would, I don't think that Judge Winmo said that those other dealers would say the same thing. He's saying that Performance Chevrolet was at court ready to bring on other witnesses, but due to the time constraints, we weren't allowed to bring those witnesses on. We sent those witnesses home. We had one sitting there when the objection was raised. And so in his limiting instruction, I think that, you know, he's acknowledging that we had witnesses that would. Were you under specific directives from Judge Winmo that you could only put on two of these people, or was it just a general overall time problem? It was just a general overall time crunch. We had four days to put on both sides, the plaintiff side and the defense side. And so, you know, essentially we had two days outside of voir dire, so. And if the judge thought that this witness had been disclosed but hadn't been disclosed, is that the problem? Well, what happened is, is we'd sent our witness after the close of discovery, we amended our witness list. And so we added a dealer at that point. It was a year before trial, but it was after the close of discovery. MarketScan moved to exclude those witnesses as an untimely disclosure. We had had other dealers who were disclosed before the discovery cutoff. MarketScan never took any depositions of any of the other dealers, nor did they ever try and put on any of their own dealers to show that their system worked properly for the other dealers. So the court held a hearing on that and decided that anybody who was disclosed after the discovery cutoff would not be allowed. The problem is when he wrote his order, he put Hannigan was one of the people that would be allowed, and I didn't go back and verify the date. But he meant to disallow him, but he said he would allow him. If I get you right. Yeah, and we're talking about numerous numbers of dealerships. We're not talking about there's four on one side and two on the other that he was going to allow and disallow. Somewhere along the line, he realized he shouldn't have given the okay to Hannigan to testify. But by that time, it was too late. So then he goes in and tells the jury, I made a mistake. I shouldn't have said that he could testify. There were other people who they could have called who would have testified basically consistently with this. So this is my fault, but I'm going to let him testify. That's what he said to the jury. Isn't that a little unusual? I mean, in retrospect, I don't think that it's ideal. But at worst, I don't think that it was a prejudicial error. I don't think that the jury was unduly influenced by the judge's comments on that. But he would have a hard time arguing that it was harmless, that he was, the witness was harmless because you were so reliant on those witnesses. In other words, if we thought this was a problem about you, to the degree there was an implication if there were other people who would have said the same thing, and if we thought that was a problem, could that be a harmless problem? I think it is. The fact is that we did have another dealer that was there saying the exact same thing. We had Ms. Hannah who was there who was timely disclosed. The judge had allowed her testimony. She's saying the same thing. She has a T1 line, and she was having problems with her downloads as well. She has the same new and used car system that Performance Chevrolet had released from market scan, and she was having the same problem. So, I mean, the fact is that we did have another dealer witness there present at trial who said the exact same thing. So I think that, at best, it is a harmless thing. All my sense is that your case was marginal. I mean, it wasn't a very strong case because you had, there was this problem of you had no experts, you had these people, you had no, you had, there was this problem with the computer having disappeared. So it seems that it might, something like this could have made a difference. I don't think that our case was marginal at all. We had a very strong case. We had the owner of Performance Chevrolet who came and talked about all of the problems that he had with the system and all of the attempts that he had made to try and get the system repaired and fixed, all of the steps that he had taken to try and correct the problems on his end if there were any problems, which is what market scan was saying. We had the reports, which are an issue on appeal as well, about from market scans in showing that it itemized out all of the phone calls that Performance Chevrolet had made to market scan. The computer and it disappearing is an absolute red herring. There's nothing on the computer. Every night when that computer has a download of information, it's replacing all of the information that was stored on the computer. So at best, the information in that computer was one night's worth of data. There was no log in the computer of information that had gone on. And if it really was such a helpful piece of evidence for the market scan, they wouldn't have waited until a month before trial. They never asked to see it. They never asked for a preservation of evidence, or they never subpoenaed the computer or anything like that? They had asked for it earlier on. We had it in our storage, and we said, come on out and look at it any time you want. And so a month before trial, they said, and this is after the close of the discovery, after the close of an expert cutoff, they've never disclosed an expert to get in any of the metadata or any of the other data that would be stored on the computer. I mean, so they wouldn't have been able to get any information in at that point anyway. So they asked to come out and look at it a month before trial. We say, come on out. Well, they wouldn't need an expert in that they are the experts on their own system. So they would have been able to have one of their own employees testify, wouldn't they? Well, they would need an expert to show how they pulled the data off the computer. Why would they need an expert if they have their own person who says, you know, this is what I do. I'm a software expert. This is how I download from the hard drive, that sort of thing. I mean, it's a little troublesome because we don't really know whether there's more data or not on that computer. But we do know that all of the data is replaced every night. So, I mean, everything, when the computer does a download, all of the information that's already on the computer for market scan is replaced and with the new night's worth of data provided it updates like it's supposed to. So at best you have the last night's worth of update. Plus the program. Plus the program itself. But the program is actually, I mean, it's a dial-up connection where you're going to market scan's mainframe server and pulling the data off of that server. So it's actually their server and their records on their end that would show the most relevant information. Hypothetically, if the program on the dealership's computer that tells the computer to go and dial up, if that had been corrupted through no fault of market scan, that could have been detected on the computer, had it been preserved, couldn't it? It was never showing that that was the case. No, I know, because the computer disappeared. No, I mean, even when they're making... I'm answering your point that all that would show would be last night's data. I'm saying that there's a program on the computer that tells the computer to go call up market scan and get the information. If they wanted to show that somehow that program had been corrupted, they couldn't do that because the computer's gone bye-bye, right? I think that the computer would have been gone anyway. Market scan has a routine practice, and that was established as well. That's a different answer to my question, though. Yes, they were going to go give the computer to the Boise High School or something. Right. But in terms of what the computer could have shown, it might have shown that there was something wrong with the program. It was more than just data on there. There was a program on there, right? I don't know if it could have showed that. I mean, it didn't just dial it up for no reason. I mean, there was a program on the computer that tells it to go dial up the... But the program didn't dial itself. Wasn't the whole point that somebody had to leave it on? I'm sorry? Somebody had to turn this thing on every night? No, the computer stays on, but you have to put it to kind of its home screen or kind of make sure that there's nothing else that they can use that. But the computer is not used for anything else, so it just kind of hangs out. The only time you'd go to a different screen is if you're running some type of a lease search. I think, again, going back to the strength of the case from performance Chevrolet's side, even market scans on employees testified that they were aware of the problems that were going out. They were unable to identify what the source of the problems were. They came out. They talked about the corruption scans that they ran when they came out to service the store. There was never any indication. They admitted that there was nothing that they had ever seen that would show that the software... Wait to hear the limitations issue. Are you relying on an estoppel theory or a discovery theory? Your Honor, we're relying on a discovery theory. This is not an equitable tolling argument at all or any kind of repair estoppel. If you look under the statute, under 10-506, it talks about the later of the discovery of the default or the failure to repair. At this point, they want to compare this to the UCC sales statute of limitations, which talks about a one-time sale, and it foresees that you'll discover the problem on tender of the goods or at least within a reasonable period after tendering the goods. In this case, we're operating under a lease statute, which contemplates the ongoing relationship between two parties in a lease situation. The goal is not to end the relationship at the point that you initiate the relationship. Under a lease situation, the thought is that you continue on with that relationship for a long period. And so the statute allows for an opportunity for the parties to cure any problems that might arise in the beginning. And in this case, performance is being told by a market scan that the problems are on their end. They have problems with their phone lines. They have problems with their dial-up connection. They have problems with this A to B switch. So they systematically went through trying to correct all of those issues. They went as far as calling their phone company, who traced it all the way back, who did a test to make sure that there's no extra white noise on their phone lines. They took off the A to B switch, and they tested all of their Internet service connections. They even changed providers for their Internet service provider just to see if that would help. So by the time they get to July of 2000, when they write their letter to market scan, they're telling them at this point, you know, we've done all these things. It's not on our end. It is on your end. And so at a minimum, that's when the statute of limitations would commence running, and that's well within the four-year statute of limitations. Can I ask, this is a case of many issues. As you know, let me ask about the attorney fee issue. Based on the jury verdict, it would be the prevailing party, but weren't there claims made, particularly fraud, on which you were not successful? And I'm wondering why there wasn't a deduct or an offset, at least for those. Well, I don't think, one, that the reasonableness or the calculation of the attorney's fees is at issue on appeal. I think that only the determination of whether Performance Chevrolet is the prevailing party or not and that market scan is here on appeal on nine different issues, I think is a good indicator that they weren't the prevailing party. And Performance Chevrolet recovered more than 80% of the damages that it sought in this case. And market scan tries to say, well, you could have raised punitives or there could have been other actions brought under the Idaho Consumer Protection Act. The reality is Performance never sought punitives. They never sought any other type of relief that they were asking. And from the get-go, there's an affidavit on file from the owner of Performance Chevrolet. They were only seeking to recoup the contract damages. This wasn't an opportunity for – Was it a purchase price or was there another element of damage? No, it's just purely the lease payments. It's all they wanted from the beginning, and they recovered more than 80% of them under the jury verdict. So I think that the prevailing party is clearly determined that it's Performance Chevrolet. And in this case, we would ask that you would affirm the district court ruling in its entirety, and then award fees on appeal as well. Thanks, Ms. Hancock. Mr. Yeager, you used up all your time, but if you want to take 30 seconds, we'll give you 30 seconds if you will keep it to that. I'd be happy to take that 30 seconds, but do you have any questions that you'd like to ask me in follow-up? Okay. I'd briefly point out that the brief clearly does invoke repair estopel. It cites Lansing in a number of Pennsylvania cases. I would point out that on the statute of limitations, if denying that you were liable acted to extend the discovery rule, I doubt you'd ever see the statute of limitations apply. And I don't think that's how the discovery rule works. Again, that's how the repair estopel doctrine works, but under that they haven't satisfied the elements. And finally, I would disagree on Hensley. Just to be clear, on the attorney fee issue, we do believe the issue may be mooted or at least reconstructed based on the outcome of this appeal. But we did, I think, specifically point out in our briefs that under Hensley, even if you're prevailing, if you don't prevail on all issues, you have to look at what was spent on those claims. And fraud is a serious claim. The civil rules of procedure require pleading the specificity precisely because defending yourself against a claim of fraud is important. Thanks very much. Thank you. Ms. Hantock, thank you as well. The case just argued is submitted. Good morning. Good morning. 0635938 Central Montana Wildlands Association v. Kimball.
judges: Silverman, McKeown, Berzon